THOMPSON, J.,
delivered a dissentient opinion, as follows:
I cannot subscribe to the opinion of the court delivered by the President, in which the rest of my brethren have expressed their concurrence; and, without intending to enter into any elaborate or detailed discussion of the question, I propose, as briefly as the nature of the case will permit, to state the grounds of my dissent. It is proper I should preface what I have to say with the remark, that I entered upon the consideration of this case with a very decided, if not settled preconceived opinion, founded upon elementary general principles, the earlier English decisions, and the tendency of the Virginia cases cited by the appellant’s counsel, as well in the argument as the petition of appeal, that a fair and bona fide verbal promise by a father, before the marriage of his daughter, to give personal property to *her or her intended husband in consideration of a contemplated marriage, executed by delivery after the marriage, and before the lien of a creditor of the father has attached by judgment and execution or otherwise, is good and valid against the creditors of the father, existing before and at the time of the ante-nuptial verbal promise— even though the father were> desperately embarrassed or insolvent — and, a fortiori, that a parol gift in presentí, upon the same consideration, not perfected by delivery of possession before the marriage, but consummated after, and before the lien of the creditor has attached, must be unimpeachable by the creditors of the father. That opinion has not been shaken, but rather strengthened, by the consideration I have given to this case, although I both entertain and express it with the more diffidence after the able opinion delivered by our worthy President and concurred in by the rest, of my brethren, sustained as it is by the reasoning and the authorities of both the court and the counsel of the appellee. I have referred to the former inclination of my mind, not for the purpose of claiming for my opinion additional weight or deference on that account, but, on the contrary, for the purpose of suggesting that my judgment may have been insensibly influenced by the bias of that preconceived opinion.
In the opinion of the majority, in consideration of the conflict of the English adjudications and those of our sister States, and m the absence of any case in point in our own court of last resort, it is treated as an open and unsettled question, and the decision purports to be based upon principle, irrespective of authority, as if it -were res integra. Without recognizing Spurgeon v. Collier and Reade v. Livingston as authority to bind and govern, but as lights only to guide, the court, in their opinion, comes to the same conclusion, and by a very similar, if not identically the same, process of reasoning. It is said that the ante-nuptial verbal promise, though made in consideration of a contemplated marriage, and though founded upon a good and valuable ^consideration, and morally binding, was not legally binding upon and enforceable against the father, and was void under the statute of frauds and perjuries, and that consequently a gift executed after marriage, in consideration of such verbal and void ante-nuptial promise, was voluntary, and therefore fraudulent and void against the existing creditors of the father, and that they might rightfully proceed, as they have done, to obtain judgments and have their executions levied and the property sold for their satisfaction, notwithstanding such gift. If the statute of frauds and perjuries could be invoked by-the creditors, and it had the effect ascribed to it by my brethren, upon the authority of the adjudged cases and learned commentators referred to in the opinion, I readily-admit the conclusion to which they arrived was inevitable. But the question is, does the statute directly or indirectly apply to such a case? Learned judges and commentators have assumed that it was enacted not only for the protection of the promiser, but for the public, and especially for creditors. I am utterly unable to understand upon what foundation the assumption rests. I can understand and appreciate both its letter and its policy, so far as it purports to protect the promiser against the evil of having oral executory contracts established and enforced against him by fraud and perjury; but when invoked by a creditor to set aside a bona fide oral contract, founded upon a good and valuable consideration, spontaneously- executed before the lien of a creditor has attached, I confess my inability to discover any sound basis for such an opinion, founded upon any just construction of the statute, or upon reasoning from general principles or the analogies of the law. The protection of creditors against voluntary and fraudulent conveyances and gifts, rests upon more ancient foundations than the statute of frauds, passed in the reign of Charles II — upon the statutes against fraudulent conveyances passed in the reign of Elizabeth ; and these statutes themselves were to some extent but the enactment *of principles condemnatory of such frauds co-eval with the common law ; and how it ever came to be supposed that the section of the statute of frauds in relation to parol contracts had for its object the protection of the creditors of the promiser, I say again I am utterly-unable to comprehend. There is not a line, or syllable, or word in the statute or its preamble that looks bey-ond the protection of the promiser. There was no necessity to make further provision for the protection of creditors; they were already protected as far as it was necessary to protect them by the statutes against fraudulent conveyances *855 and the common law. This, I presume, is the specious process of reasoning- by which to arrive at the conclusion that the statute of frauds and perjuries had in view the protection of the creditors of the promiser — to suppose that the Parliament, when they were enacting a law rendering the parol or verbal promise invalid as to the promiser, for his protection, had in their mind’s eye also his creditors, and intended for their protection to make such a promise nudum pactum and voluntary, in order to bring it within the prohibitions of the statutes against fraudulent, conveyances and the common law against fraudulent gifts. But, unfortunately for this argument, at the time of the enactment of the statute, and later even than the times of Lord Mansfield, the suggestion that such a parol promise or gift as this was a nudum pac-tum or voluntary in legal contemplation, would have been scouted as an absurdity. It is only in the modern decisions that any countenance is given to the idea that such a promise or gift is void by the statute of frauds, and therefore a nudum pactum and voluntary.
I agree with the commentators and the learned judges, that the statute was intended for the benefit and protection of the public, by furnishing a protection to the individuals of that public who needed and chose to claim the benefit of that protection. I presume it will be conceded that the statutes of limitations, of bankruptcy, of usurj, of gaming, and the '^statute and common law creating the disability of infancy, -whilst in the same sense public statutes, intended for the protection and benefit of the public by the protection furnished individuals, were by no means intended for the protection of the creditors of the debtor discharged by lapse of time, the creditors, whether new or old, of the certificated bankrupt, the creditors of the borrower at usury, or of the loser at unlawful games, or of the infant. If these statutes, both in letter and spirit, are held applicable only to the classes of individuals in terms protected by the enactments, and not to their creditors, how can we arrive at the conclusion that the policy of the statute of frauds was more comprehensive than its letter. Upon principle, it would seem to me much more reasonable that the creditor of the victim of usury, or of gaming, or the new creditor of the certificated bankrupt should have the right to rely upon the protection of these statutes against the will of their debtors, than that the creditor of a person who has made a bona fide verbal contract upon a valuable consideration, and who has voluntarily yielded to the claims of conscience and justice and actually fulfilled and executed this verbal contract. Whilst it might be a very wise policy to allow a man to invoke the aid of the statute to shield him from the enforcement of a contract sought to be established, as he might believe, by fraud and perjury, it surely could not have been the policy of the statute to encourage, nay, as is' done by the construction of the statute which I am combating, to compel, the violation of a bona fide parol contract, made upon the highest and most favored consideration known to the law, against the will of the promiser. And wherefore this compulsory violation, or rather abrogation, of such a verbal contract, executed and consummated by a perfect gift in favor of a party who has acquired' no lien to justify him in gainsaying it? The only answer that can be given is, to prevent the violation of another contract, "*to wit: with his creditors — certainly no more, if not in legal contemplation less, sacred.
It is admitted, that a debt contracted in infancy is a sufficient consideration to support a promise made by the adult; that a debt barred by the statute of limitations or discharged by bankruptcy will support a new promise or contract re-binding the debtors. Nor will it be denied that, before the new Code, a creditor had not the right, even though it were the only means of saving an otherwise insolvent debt, to impeach a transaction for the most grinding usury practiced upon his debtor. His debtor might have sold his property to his usurious creditor in payment of usurious premiums, and yet the creditor, as the law aforetime was, could not gainsay it; and yet, according to the argument, when his debtor has parted with his property in fulfillment of a bona fide verbal contract founded upon the most valuable and most meritorious consideration, he may, by reason of the statutes of frauds, treat the transfer as voluntary, fraudulent and void.
The modern decisions, to evade the force of the argument from analogy, founded on the cases of the new promise after the bar of the statute of limitations, the discharge in bankruptcy and the promise by the adult to pay the debt contracted in infancy, take a distinction that, to my mind, is a distinction without a real though a seeming difference. They say, the old debt will be a sufficient consideration for the promise to rebind the debtors exonerated by the statute of limitations and bankruptcy, because the original contract was legally binding and enforceable, whilst by force of this statute of frauds the parol contract was never legally binding and enforceable, but void — not voidable; and, because void, its performance by the promiser was voluntary and founded on a nudum pactum. If that were a satisfactory answer to the case of the debtor discharged by limitation or bankruptcy, how are they to get rid of the analogy founded on the case *of the infant binding himself after he came of age? His contract was never legally binding nor enforceable unUl he voluntarily bound himself after attaining age. But it is said, his contract was not absolutely void, but only voidable, whilst the parol promise under the statute is absolutely void, and not voidable only. Why the contract of the infant should be deemed only *856 voidable, and therefore capable of confirmation, when adult, and the parol contract, even though founded upon the most valuable consideration, utterly void and incapable of confirmation, would puzzle the astuteness of legislators and judges and commentators to tell, unless thus qualified and explained: void so far as to be incapable of sustaining an action upon an executory contract against the promiser, but not void in the sense and to the extent of making such a contract voluntarily performed and carried into gift, grant or conveyance, a voluntary gift, grant or conveyance, within the purview of the statutes against fraudulent conveyances, and therefore fraudulent and void.
The criterion or test by which to ascertain whether a contract be nudum pactum, or a conveyance or gift voluntary in legal contemplation and within the meaning of the statutes against fraudulent conveyances, is the presence or absence, the existence or non-existence of a valuable consideration, and not the criterion or test established by the statute of frauds and perjuries in relation to actions brought to enforce verbal contracts. It passes my comprehension to understand how a contract founded on a valuable consideration can be called a nudum pactum or a conveyance or gift founded on the like consideration voluntary. It seems to me, that the authorities referred to have confounded the spontaneous performance of a contract founded on a valuable consideration, which, from motives of policy, the law would not have compelled the promiser to perform, whilst it remained executory, with a contract, gift or conveyance founded on a merely moral consideration, and which in law is deemed voluntary and ^fraudulent and void as to creditors. The proposition that a verbal promise, by reason of the statute of frauds, becomes insufficient to support a subsequent contract, gift or conveyance founded upon that consideration, because of its being nudum pactum or voluntary, has been maintained in modern decisions, combating and overruling Lord Mansfield’s doctrine that a moral consideration is sufficient to sustain an express promise, upon a distinction founded upon the difference between a consideration beneficial to the promiser and the consideration injurious to the promisee.
In the case of the beneficial consideration founded on a quid pro quo, where the law would imply an assumpsit, without any express promise or contract, where it is said, after the right of action has ceased, and the remedy gone, in consequence of some positive enactment, founded on public policj', the valuable consideration still remains, and constitutes a sufficient basis on which to found a binding new promise, as in case of bankruptcy, the statute of limitations and contracts made in infancy; but that where the consideration of the promise is of the other kind, founded on injury, to the promisee, such as marriage, or the undertaking to become bound for the debt, default or miscarriage of another, although confessedly valuable; yet as no implied assumpsit could be predicated upon it, and when first made it was incapable of enforcement, by reason of positive enactment, (although intended for the protection and benefit of the promiser alone, as I have endeavored to shew,) no subsequent express promise can impart to it legal vitality and legal validity, so as to exempt it from the imputation of being a nudum pactum and voluntary, and therefore fraudulent and void, as against creditors. Though plausible, I cannot recognize the propriety of such a distinction, founded on the difference between the consideration founded on a quid pro quo, or beneficial to the promiser, and that founded on injury to the promisee, in a system of jurisprudence which recognizes marriage as not only valuable, but the *most highly-favored and valuable consideration known to the law — more valuable even than money or money’s worth. And, to cap the climax of the incongruity of holding the statute of frauds applicable to such a case as this, we have the case of a statute, in terms (and in its spirit and policy no more) protecting the promisor against an action upon an executory verbal contract, (though founded upon valuable consideration, and which protection he may waive or not at his election,) applied to the case, and invoked to set aside and annul a bona fide parol contract, made upon the most valuable consideration known to the law, and thereafter, before the lien of any creditor had attached, executed and carried into perfect gift; and not only so, but this proved by the very party himself, as a witness upon oath, for whose benefit and protection, and for whom alone, as I insist, the statute was enacted.
I have thus, upon . the elementary principles and the analogies of the law, without a reference to and reliance upon direct adjudication to sustain me, brought myself to the conclusion that it is a perversion and misapplication of the statute of frauds, to hold that it has any relevancy to or bearing on the question involved in this case, and that, without the aid of that statute, I do not understand any one as intimating' that the gift of the slave could be successfully impeached by the creditors, upon the evidence in this case. So to construe the statute as to make it the instrument for impeaching and invalidating such a transaction as this, would be to convert what was intended only as a shield for the protection of the promiser, into a sword in the hands of his creditors, to be used to the injury of others equally or more entitled to protection to save themselves from loss. I cannot surrender my own strong convictions in deference to the modern authorities cited in support of that construction of the statute, nor can I see the good sense and reason of the decisions which draw the novel distinction between considerations, and ascribe to the one kind an efficacy and effect which they deny to the other; *857 *in holding', that whilst the old debt is a sufficient consideration to support a new promise by the debtor, protected by the statute of limitations, and to support a new promise by the bankrupt after his discharge in bankruptcy; yet that a parol promise, founded on the other consideration, is insufficient to support a subsequent express promise, though clothed with all the legal forms and solemnities necessary to have made it legally binding and enforceable by action or suit.
I admit that the modern English authorities, cited at the bar and by the court in the opinion of the majority of my brethren, are against me, as well as the American cases relied on, which are entitled to the most respectful consideration: I allude to the direct adjudication of Spurgeon v. Collier, 1 Eden. 61, which has received the unqualified approbation of the distinguished modern text-writers Atherly, Bright and Roper, and to the case of Reade v. Livingston, 3 John. Ch. Rep. 481, decided by Chancellor Kent. Judge Story, too, has been relied on in support of the doctrines of Spurgeon v. Collier, and Reade v. Livingston; but I think it doubtful, to say the least, whether the section of his Commentaries, referred to, (§ 374, vol. 1,) read in connection with the significant query contained in the concluding part of note 2, appended to that section, can with propriety be relied on as authorit}' against the pretensions of the appellant in this case: Eor, after referring in the text to the struggle of courts of equity to maintain the efficacy of post-nuptial settlements against creditors, where it purported to be founded upon a parol agreement before marriage, recited irj the settlement, (doubtless referring to Montacute v. Maxwell and Dundas v. Dutens,) and the strong inclination of the courts in modern decisions to consider such a settlement incapable of support from any evidence of a parol contract, by reason of the statute of frauds and perjuries, without expressing any opinion of his own in the text, he proceeds, in note 2, to give a brief commentary on the cases, and after deducing from them the conclusions, that the statute was ^'applicable to ante-nuptial parol promises in consideration of marriage; that a subsequent marriage was not a past performance to take such a promise out of the statute; that although, in cases of fraud, equity would relieve against the words of the statute, yet where there was no fraud, only relying upon the honor, word or promise of the defendant, the statute making these promises void, equity would not interfere, and saying “all this seems perfectly correct,” he winds up with this very significant and suggestive query: “But suppose the party to have fulfilled his parol promise after marriage, ought a court of equity to disturb the settlement in favor of creditors? The marriage in such a case is not the less a valuable consideration because a parol promise was relied on; and if relied on as valid, and the marriage is had on the faith thereof, is not the non-fulfillment of it a fraud upon the other party, whether intentional or not?” How Judge Story would have answered his own query I know not; but it seems to me to be incapable of any other correct solution, than that which I have given to it, upon general principles and all the analogies of the law — for the case supposed by him and our case are in principle one and the same.
But concede, for the sake of the argument, that Judge Story was properly cited as authority to support the rulings of the cases of Spurgeon v. Collier and Reade v. Livingston, then I call to my aid and support in opposition to them, the early English adjudications of Montacute v. Maxwell and Dundas v. Dutens, and the Virginia cases of Moore v. Downey, 3 H. & M. 127; Chichester v. Vass, 1 Munf. 98; Argenbright v. Campbell, 3 H. & M. 144, and Huston’s adm’r v. Cantril et al., 11 Leigh, 176. The English cases are express authorities in point, and the Virginia cases, (except Argenbright v. Camobell,) though not in point, are cited for their tendency to sustain the doctrines of the early English cases; and 1 think Argenbright v. Campbell is and has always been considered in Virginia as a direct authority in favor of the doctrines held in Dundas *v. Dutens, to wit, the sufficiency of an ante-nuptial parol contract to sustain a written agreement, settlement or executed gift after the marriage. Mr. Tate, in his Digest, edition of 1841, p. 718, so understood it — and so, it seems to me, properly understood it. True, it was a bill filed by the son-in-law and the daughter against the father, and a purchaser, from the father, with notice, of the land which was the subject of the ante-nuptial parol promise; true, a written promise was executed after the marriage founded on the consideration of the parol promise before; true, this written promise was held to be a bond or sealed instrument, though very informally drawn; yet the point adjudged which laid at the very foundation of the decision, and without which it could not be sustained, was that a parol promise by a father to the intended husband of his daughter, is a sufficient consideration to sustain a written agreement after marriage, if such agreement be in other respects sufficient under the statute of frauds. The court do not rest their decision upon the fact that the subsequent agreement was a bond or specialty, but say a written agreement not under seal was sufficient. 1 take it the decree would have been the same if Argenbright had been a creditor instead of a purchaser without notice ; because, if the subsequent written agreement was founded on a sufficient consideration to bind the father-in-law in a bill for specific execution, it would have bound creditors equally with purchasers, unless the registry acts interposed a barrier, which was not pretended in that case, the subsequent written agreement being recorded. Unless the ante-nuptial parol agreement had constituted a sufficient con *858 sideration for the subsequent written one, Campbell was not bound by it, and he could not have been compelled to execute it; for a written contract, not under seal, without consideration, is as much a nudum pactum as a verbal one — and if a nudum pactum, notice of it by Argenbright was notice of a void thing, and in a contest between him, having procured the legal title for *value, though with notice of the claim of the volunteers, he must have prevailed just as certainly as if he had been a creditor. If, then, I am right in my interpretation of the decision of the court in this case, it is directly in point, and decisive of the one under consideration ; for it must follow, as an inevitable consequence, if a parol contract before marriage, will support a merely written executory agreement, not under seal to comply with the parol promise executed after the marriage, and will make that written agreement enforceable at law and inequity, that the same consideration will support and validate an executed gift or transfer by delivery of the thing promised before and in consideration of marriage.
But, suppose I am wrong, and my brethren right in their reading of that case, and I am driven to rely upon the tendency or indirect bearing of the other Virginia cases, I think the case of Huston v. Cantril ought to have a potential influence upon the decision of this. And this case, be it remembered, is in accordance with English adjudications and one, at least, in New York of Chancellor Kent’s. In that case, the Court of Appeals in Virginia held, that the consideration of marriage was so highly favored in law, that if a father, not in contemplation of marriage, make a fraudulent and voluntary conveyance of property to a daughter, and that daughter afterwards marry, without any negotiation or treaty with the father, nay more, if the husband marry without the knowledge even of the gift by the father and the possession or claim of title on the part of the daughter, that the ex post facto marriage ipso facto purges and validates the deed, gives it a retrospective validity and makes both husband and wife bona fide purchasers ab ini-tio from the father. The law presumes and will hear no proof to the contrary, although the reverse, or proof of his ignorance of it is patent in the record, that he speculated upon the possession of and claim of title to the property by the wife, and I think we are warranted in inferring from what the court did *say, that even knowledge of the fraud or mala fides of the conveyance would not prevent the application of the principle. Now, if this case be law, as it was conceded by the judge in the court below in the instruction given, and is conceded by the opinion which has been delivered — and if it be conceded, as it cannot be denied, that marriage constitutes a valuable consideration, even more valuable in legal contemplation than money or money’s worth, and that a parol promise in writing, or a gift executed before marriage, is valid and obligatory upon the father and his creditors, however much indebted, and though the enforcement of the promise and execution of the gift should make him a bankrupt and defeat all his existing creditors, can we, without imputing to the law the most glaring incongruity and grossest inconsistency, hold, that if a father, by a parol promise made one day induces a man to marry his daughter the next by a promise which he the da3 after bona fide executes and performs, that that execution and performance is founded upon a nudum pactum and is voluntary and fraudulent as to creditors? Would it not, if I may be allowed to use a homely metaphor, be straining at a gnat and swallowing a camel? Certainly two such inconsistent and incongruous principles ought not to find a place in the same system of jurisprudence. One or the other ought to be abrogated by legislation or judicial decision.
And here I would remark, in reference to that part of the opinion of the court which assumes that policy and expediency call for such a decision as they have rendered to suppress the mischief and frauds upon creditors that would result from sanctioning the efficacy and sufficienc3 of such ante-nuptial parol promises to support a subsequent settlement or gift, that I cannot perceive how tolerating such a transaction as the present would be more mischievous than tolerating a written promise or a gift executed before marriage, or a written promise after marriage founded on a verbal promise before, or such a transaction as is held *to be legitimate in Huston v. Cantril. It seems to me, if mischief and fraud link in or are to be apprehended from these marriage contracts or settlements and are to be remedied b3 judicial decisions, my brethren have not struck at the root of the evil, which is the recognition, by the law, of marriage as a valuable consideration; for, once admit that, and it seems to me that the conclusions I have drawn from it irresistibly follow.
I am therefore of opinion, that the judgment of the court below should be reversed, and judgment rendered in favor of the plaintiff in the court below upon the first verdict found by the jury.
Judgment affirmed.